# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

**TERRELL MONTEZ STRAWDER,**

    **Petitioner,**

-vs-                                                    Case No.   5:17-cv-24-Oc-36PRL

**SECRETARY, DEPARTMENT
OF CORRECTIONS, et al.,**

    **Respondents.**

_____/

## ORDER DENYING PETITION

      Petitioner, a Florida prisoner acting *pro se*, initiated this action for habeas corpus relief pursuant to 28 U.S.C. § 2254 (Dkt. 1). Upon consideration of the petition, the Court ordered Respondents to show cause why the relief sought in the petition should not be granted (Dkt. 5). Thereafter, Respondents filed a Response and Appendix (Dkts. 6, 7). Petitioner has filed a Reply (Dkt. 10). Because the Court may resolve the petition on the basis of the record, an evidentiary hearing is not warranted. *See* Habeas Rule 8(a).

## I. PROCEDURAL HISTORY

      After a jury trial in Marion County, Petitioner was found guilty of armed carjacking; attempted second degree murder; and aggravated battery. (Dkt. 7, Respondents' Exhibit A, pp. 78-87, hereafter "Exh."). The evidence presented at trial demonstrated the following facts:

      On the evening of July 9, 2011, Valerie Robinson, 26, and her brother Nicholas Dloughy, 18, went to a nightclub in Ocala. (Exh. A, Trial Transcript, pp. 113, 115, 173, 178). At the nightclub, Ms. Robinson met the Petitioner, who offered to buy Mr. Dloughy a tank of gas in exchange for a ride to a friend's house. *Id.* at 117-19, 181-86. When they left the club around

2 a.m., Petitioner directed them to a "blue house" in Belleview. *Id.* at 119, 184, 351. Petitioner got out of the car and spent a few minutes at the residence before returning to the car and directing Mr. Dloughy to another home, this one belonging to Steve and Michelle Holder. *Id.* at 122, 187. While there, Mr. Dloughy watched television in the living room with Mr. and Mrs. Holder while Ms. Robinson and the Petitioner went to the bedroom. *Id.* at 122, 187.

In the early morning hours of July 10, 2011, the trio left the Holders' home, with Mr. Dloughy complaining of the possibility his car might run out of gas and Petitioner directing them to different locations. *Id.* at 119, 124, 204. Petitioner asked Mr. Dloughy to pull over so he could use the restroom; at this time Mr. Dloughy was in the driver's seat, Ms. Robinson was in the passenger seat; and Petitioner was in the back seat of the car. *Id.* at 126. When Ms. Robinson asked Petitioner why it was taking so long to get him home, Petitioner became hostile. *Id.* Petitioner then reached over from the back seat and put the car in reverse and pulled the keys from the ignition. *Id.* Petitioner then reached a knife around Mr. Dloughy's chest and stabbed him. *Id.* at 126, 206. The knife then went through Mr. Dloughy's hand. *Id.* at 207. Petitioner then drew his knife to Mr. Dloughy's throat, at which time Ms. Robinson grabbed Petitioner's hand and told Mr. Dloughy to run. *Id.* at 128, 208. He collapsed a few yards away. *Id.*

Petitioner drew his knife through Ms. Robinson's hand, nearly severing most of her fingers. *Id.* at 128. Ms. Robinson tried to escape out the passenger side door but Petitioner dragged her by the hair and started driving. *Id.* at 129-31. Ms. Robinson was able to slip out of her shirt and jump out of the passenger door window. *Id.* at 131. Petitioner then lost control of the car and it crashed. *Id.* at 63, 131, 320. Meanwhile, Kenneth Danner, who lived nearby, had heard Ms. Robinson's screaming and looked out to see Petitioner pull Ms. Robinson

back into the car and begin driving. *Id.* at 62-63. Mr. Danner was an acquaintance of the Petitioner and recognized him. *Id.* at 63. Mr. Danner then heard the crash and saw Petitioner walking toward him. *Id.* Mr. Danner's house guest, David Perry, also saw the Petitioner walking toward them. *Id.* at 79. Both Mr. Danner, Mr. Perry, and another neighbor, Mykel Pierson, independently identified Petitioner out of a photo lineup 1-2 days after the crash. *Id.* at 67, 80.

Mr. Dloughy had staggered to a nearby house, occupied by nurse Patricia Allen, who administered first aid and waited for an ambulance to arrive. *Id.* at 96-100. Ms. Robinson had also run to a nearby house, where Karen and Mike Spata called 911 and attempted to stop her immense bleeding. *Id.* at 83, 90. Petitioner was eventually found hiding in a closet at the "blue house" where he, Mr. Dloughy, and Ms. Robinson had visited the night of the incident. *Id.* at 119, 183, 373-75, 465, 467, 494.

At the October 2012 trial, Mr. Dloughy, Ms. Robinson, Mr. Danner, Mr. Perry, Mr. and Mrs. Spata, and Nurse Allen all testified for the State. Other evidence included testimony that Petitioner's DNA was obtained from the driver's side airbag of the crashed vehicle. *Id.* at 301, 422. Petitioner's DNA was also found on a pair of shoes with distinctive sole prints which had been left by the mailbox on the Danner property. *Id.* at 60, 286-87, 321, 429.

Petitioner testified at his trial. *Id.* at 490. His version of events was that Mr. Dloughy and Ms. Robinson tried to rob him because he had drugs and money. *Id.* at 500. Petitioner said that the knife belonged to Ms. Robinson, and that he suffered three small stab wounds to his left thigh during the incident. *Id.* at 502.

Also testifying on Petitioner's behalf were Steve Jones, Zondrey Sessler, and Ashley West. *Id.* at 443-485. Mr. Jones testified that he was driving Petitioner on the night in

question, and they arrived at the house in Belleview and that Mr. Dloughy and Ms. Robinson arrived in a red car. *Id.* at 446. After being at the house for a few minutes, Petitioner drove with Mr. Dloughy and Ms. Robinson to Steve and Michelle Holder's house. *Id.* at 448. Mr. Jones arrived separately, and they all did drugs. *Id.* Mr. Jones left approximately 20 minutes later. *Id.* Mr. Jones testified that he picked Petitioner up at the Holders around 11 p.m. and drove him around to several houses. *Id.* at 450-51.

Mr. Sessler testified that the night of the incident a car pulled up to his house around midnight with a male, a female, and Petitioner. *Id.* at 460. Ms. West was Mr. Sessler's girlfriend at the time. She testified that sometime past 11 p.m., Petitioner pulled up to her home with a white female driver and another white passenger in the car. *Id.* at 478.

Petitioner was found guilty and sentenced to life in prison. (Exh. A, pp. 74-87, 224-27.). Petitioner appealed, and on December 16, 2014, the Fifth District Court of Appeal *per curiam*, without opinion, affirmed his conviction and sentence. (Exh. D); *Strawder v. State*, 162 So.3d 1039 (Fla. 5th DCA 2014).

On January 15, 2015, Petitioner filed a motion for postconviction relief pursuant to Fla. R. Crim. P. 3.850. (Exh. F, pp. 1-19). The state court conducted an evidentiary hearing on May 29, 2015. The postconviction court denied the motion on September 24, 2015, and Petitioner appealed. (Exh F, pp. 88-190). The Fifth District Court of Appeal affirmed *per curiam* without opinion on July 5, 2016. (Exh. I); *Strawder v. State*, 197 So.3d 57 (Fla. 5th DCA 2016).

On January 17, 2017, Petitioner filed the present petition, which Respondents concede is timely. Petitioner raises five grounds for relief: (1) appellate counsel was constitutionally ineffective for failing to raise any grounds on direct appeal; (2) trial counsel failed to prepare an

4

adequate defense and present an expert in DNA science; (3) trial counsel failed to challenge the State's DNA expert; (4) trial counsel failed to investigate or present the testimony of Benjamin Monts, Steve Holder, or Michelle Holder; and (5) the cumulative errors of counsel deprived Petitioner of his Sixth Amendment right to a fair trial. (Dkt. 1).

## II. GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

### A. Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the

holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

**B. Ineffective Assistance of Counsel Standard**

Claims of ineffective assistance of counsel are analyzed under the test set forth in *Strickland* v. *Washington*, 466 U.S. 668 (1984), which requires a petitioner to demonstrate both

6

deficient performance by counsel and resulting prejudice. Demonstrating deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. Additionally, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*.

Petitioner must demonstrate that counsel's alleged errors prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691-92. To show prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

Sustaining a claim of ineffective assistance of counsel on federal habeas review is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citations omitted). *See also Cullen v. Pinholster*, 563 U.S. 170, 202 (2011) (a petitioner must overcome the "'doubly deferential' standard of *Strickland* and AEDPA.") (citation omitted).

If a claim of ineffective assistance of counsel can be resolved through one of the

7

*Strickland* test's two prongs, the other prong need not be considered. 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998) ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").

### C. Exhaustion of State Remedies and Procedural Default

Before a district court can grant habeas relief to a state prisoner under § 2254, the petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state post-conviction motion. *See* § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845.)

To exhaust a claim, a petitioner must make the state court aware of both the legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its' prisoners federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State. . .if he has the right under the law of the State to raise, by any available

procedure, the question presented." *Pruitt*, 348 F.3d at 1358. The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004).

The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim. 28 *U.S.C. § 2254(b)(1); Picard v. Connor*, 404 U.S. 270, 275-76 (1971). A petitioner may raise a federal claim in state court "by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such claim on federal grounds, or simply by labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F. 3d 695, 703 (11th Cir. 1999). *See also Murray v. Carrier*, 477 U.S. 478 (1986). To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions. *United States v. Frady*, 456 U.S. 152 (1982). The petitioner must show at least a reasonable probability of a different outcome. *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

9

Alternatively, a petitioner may obtain federal habeas review of a procedurally defaulted claim if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carrier,* 477 U.S. at 495-96. A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must show a reasonable likelihood of acquittal absent the constitutional error. *Schlup*, 513 U.S. at 327.

## III. ANALYSIS

**Ground One**

Petitioner argues that appellate counsel was ineffective for failing to raise any of "those arguable issues that were preserved by trial counsel" on direct appeal. (Dkt. 1, p. 7). Appellate counsel filed a brief pursuant to *Anders v. California,* 386 U.S. 738 (1967). (Exh. B). Petitioner did not present this issue to the state courts and has now procedurally defaulted this claim.[1] He points to the Supreme Court's ruling in *Martinez v. Ryan,* 566 U.S. 1 (2012) to excuse the procedural default. (Dkt. 1, p. 5). However, the Eleventh Circuit has "repeatedly underscored *Martinez*'s narrow scope and emphasized that *Martinez* applies only to excusing a procedural default of ineffective-trial-counsel claims. Any broadening of *Martinez* to excusing a default of ineffective-appellate-counsel claims would ignore the Supreme Court's emphatic

---

[1] *See* Fla. R. App. P. 9.141(d)(5): "A petition alleging ineffective assistance of appellate counsel on direct review shall not be filed more than 2 years after the judgment and sentence become final on direct review unless it alleges under oath with a specific factual basis that the petitioner was affirmatively misled about the results of the appeal by counsel. In no case shall a petition alleging ineffective assistance of appellate counsel on direct review be filed

10

statements that *Martinez* creates only a narrow exception to *Coleman*'s general rule." *Luciano v. Sec'y, Dep't of Corr.*, 701 Fed. Appx. 792, 794 (11th Cir. 2017) (*per curiam*) (citing *Chavez v. Sec'y, Fla. Dept' of Corr.*, 742 F.3d 940, 945 (11th Cir. 2014) and *Coleman v. Thompson,* 501 U.S. 722 (1991)).

This Court is precluded from considering Ground 1 because Petitioner did not present the claim in the state courts, it is now procedurally defaulted, and he has failed to demonstrate any exception to the doctrine of procedural default (i.e., cause and prejudice or fundamental miscarriage of justice). Ground 1 is dismissed.

**Ground Two**

Petitioner contends that trial counsel was ineffective for failing to adequately prepare a defense and present a DNA expert. (Dkt. 1). In rejecting this claim on post-conviction review, the state court wrote:

> [DNA expert Kristen] Schaad testified that if multiple people touch an item that you can get a DNA mixture, but that sometimes you don't obtain any results because not enough DNA was left as a result of a touch. Schaad stated that when you have a DNA mixture from at least two individuals, a major donor or contributor is an individual that has donated more DNA than the other. The driver's side air bag contained a DNA mixture with Defendant as the major contributor and Valerie Robinson (victim) as the minor contributor. Counsel conducted a cross-examination of Schaad, including questions regarding touch DNA.
>
> Prior to Schaad's testimony, Kathleen Schmidt ("Schmidt"), forensic crime scene technician with the Marion County Sheriff's Office, testified about her investigation in this case. Schmidt testified that she took a swab of the driver's side airbag for suspected touch DNA, but she did not see any suspected blood on the airbag.
>
> …

---

more than 4 years after the judgment and sentence become final on direct review." Mandate issued in Petitioner's direct appeal on January 9, 2015.

The Defendant testified that Nick Dloughy (victim) was driving when the car crashed and the airbag deployed. However, the DNA evidence presented does not support his claim. Furthermore, during closing arguments Counsel actually raised Defendant's theory that Valerie's DNA was found on the driver's side airbag not from the wreck, but that she touched the airbag when she returned to the vehicle after the crash to search for drugs and money. Defendant's motion alleges that she touched the airbag with her bloody fingers, but that theory was refuted by Schmidt.

…

At the Evidentiary Hearing, Counsel testified regarding his strategy in dealing with the DNA evidence:
> Q: Now, tell about this DNA.
> A: Well, the issue with the DNA, I never even saw that as an issue of me --- or I should say for Mr. Strawder because, so there's DNA on the air bag. And regardless of whether or not Strawder was in the seat or in the back seat, to me it seemed very likely and reasonable that his DNA in an accident would end up on that air bag.
>
> ….
>
> So, I didn't think that the testimony of the DNA expert - - I mean, I knew what the DNA expert was going to say was I tested it and his DNA was on the air bag.
> And then there was also the reality that if he was in the back and they got into a wreck, he still could've ended up hitting that air bag because he didn't have a seat belt on. So, either way, I thought that there were very reasonable explanations for that and that it just wasn't very significant.
> Where I was thrown off – and you know, should I have had an expert? I mean, when she said that – I forget how she cast it, but basically said it was highly unlikely that his DNA would have ended up there if he wasn't in the front seat. I mean to be honest, I never saw that coming because even today it seems preposterous to me. I don't see how she could know that.
> And I know that I cross-examined her on that some. And I think if I remember, she couldn't really give her reasoning; that was just her opinion, you know. But she couldn't really substantiate it with science.

(Exh. F, pp.90-92) (internal citations omitted).

As Petitioner explains in his petition, his version of events was that Ms. Robinson produced a knife, a struggle ensued, and Mr. Dloughy (who was driving) crashed the car.

Petitioner was rendered unconscious. When he awoke, Mr. Dloughy and Ms. Robinson were gone. Petitioner exited the vehicle via the driver's side door. (Dkt. 1, p. 9). The DNA evidence showing that Petitioner came into contact with the driver's side air bag is consistent with his version of events. Therefore, even assuming trial counsel was somehow deficient, Petitioner cannot demonstrate prejudice where the DNA evidence was consistent with his own testimony and where there were multiple eyewitnesses identifying him as the perpetrator of the crime, as well as witnesses who saw him drive the car while dragging Ms. Robinson. Petitioner has failed to demonstrate that but for trial counsel's actions related to the DNA expert or failure to obtain his own, that the jury would have rendered a not guilty verdict.

Petitioner has failed to demonstrate that the state courts' denial of this claim was an unreasonable application of *Strickland* or based on an unreasonable determination of the facts. Accordingly, Ground 2 does not warrant federal habeas relief.

**Ground Three**

Petitioner contends that trial counsel was ineffective for failing to ensure that the State's DNA analyst was declared to be an expert witness. As a result, Petitioner alleges she was testifying as a layperson and her testimony was inadmissible; trial counsel failed to object. (Dkt. 1). In rejecting this claim on post-conviction review, the state court wrote:

> An expert is defined as a person who is qualified as an expert in a subject matter "by knowledge, skill, experience, training, or education." § 90.702, Fla. Stat. Whether a witness is qualified as an expert is largely a matter for the discretion of the trial court. *See e.g., Ramirez v. State*, 542 So. 2d 352, 355 (Fla. 1989). Counsel must elicit from the witness that part of the witness's background which qualifies the witness as an expert. *See Crump v. State*, 622 So. 2d 963, 968 (Fla. 1993). It is not necessary for counsel to formally proffer or tender a witness as an expert to the court. *Smith v. State,* 7 So.3d 473, 496 (Fla. 2009). In fact, it may be an improper comment by the court if the witness is "declared" an expert before the jury. *See Alexander v. State*, 931 So. 2d 946, 951 (Fla. 4th DCA 2006).

> Schaad testified regarding her education, employment history, training, the proficiency testing she has undertaken, and the standard operating procedures involved in her line of work. *Trial Transcript*, p. 408-14. Based on her testimony, any objection challenging her qualification as an expert in DNA analysis would have failed.
>
> …
>
> Defendant has failed to show that Counsel was defective for failing to object to Schaad testifying as an expert in DNA analysis. Objections regarding Schaad's qualification as an expert and the alleged improper bolstering would have failed. This claim is thus also without merit.

(Exh. F, pp. 94-95).

Petitioner has failed to demonstrate that trial counsel was deficient where he failed to raise an objection that would have failed under Florida law governing the trial. Nor has Petitioner demonstrated prejudice under *Strickland* where, as discussed in Ground 2 above, there was ample evidence to convict him even without consideration of the testimony of Ms. Schaad.

Petitioner has failed to demonstrate that the state courts' denial of this claim was an unreasonable application of *Strickland* or based on an unreasonable determination of the facts. Accordingly, Ground 3 does not warrant federal habeas relief.

**Ground Four**

Petitioner alleges that trial counsel was constitutionally ineffective for failing to interview and call to trial witnesses Benjamin Monts, Steve Holder, and Michelle Holder. Benjamin Monts lived at the "blue house" Petitioner and the victims stopped at the night of the incident, and the Holders were the couple at whose home Petitioner and Ms. Robinson went to the bedroom while her brother watched television with the Holders. (Dkt. 1, pp. 24-27). In rejecting this claim on post-conviction review, the state court wrote:

14

Defendant alleges that the testimony of Benjamin Monts ("Monts") would have supported his version of the events that transpired the night of the crime. Monts would have testified that he was familiar with the victims in his case because he regularly sold them drugs. Monts was at "a place known for its drug trade" when he introduced Defendant to Valerie to facilitate a trade of sex for drugs. His testimony would have allegedly disproven the victims' claims that they met Defendant at Club Zanzibar. Defendant claims Counsel was ineffective for failing to investigate and failing to call Monts to testify at trial.

…

Based on the record in this case, Counsel scheduled a deposition of Benjamin Monts, Jr. The court file does not contain a copy of the deposition so it is unclear whether or not the deposition took place. What is clear is that a subsequent subpoena was not served on Monts because he was incarcerated in the Department of Corrections. During his closing arguments, Counsel indirectly explained why he did not call Monts as a witness:

She also gave [Detective] Eric [sic] Dice precise instructions to that house, so good that Eric [sic] Dice was able to go back to that house to go find Ben and talk to him, **who, of course, denied any kind of drug activity at his house, because no drug dealer is going to do that.**

Trial Transcript p. 591. (Emphasis added). Counsel's statement illuminates the fatal flaw to Defendant's claim; Defendant is relying on a witness to admit on the witness stand that he has committed one or more crimes as a crack cocaine dealer. The crux of Defendant's argument requires a witness confessing to a felony. Defendant cannot show that there is a reasonable probability that the result of the trial would have been different had a convicted felon / drug dealer (Monts) been called as a witness. The strategic decision not to present prospective testimony of an incarcerated drug dealer, including a confession of committing potentially uncharged felonies, does not undermine the confidence in the outcome of this case.

Furthermore, at the Evidentiary Hearing, Counsel was questioned regarding his decision not to call Monts as a witness:

> A:  Well, I mean let me touch on what I think is what you want to know is the witnesses that were not called.
> So, Monts, I mean I have to say I never did talk to Monts, but I did not think --- I did not want to bring him into the equation because I liked the other people that were going

> to testify for Terrell. They didn't have criminal records; they presented well.
>
> I did not want to --- he was in prison at the time and I didn't want to walk a guy out in stripes and chains with a bad criminal record to be associated with Terrell. I've got him associated with better people that are going to testify that don't have a criminal record. And I didn't feel like there was really any benefit to his testimony. We've already got one person that doesn't have a bad record who's going to testify that yeah, you know, they had come over to buy drugs and the stuff about the club wasn't true.
>
> …
>
> And I felt the same way about the other two, as well. You know, for one, they're going to admit to doing drugs.
>
> …
>
> Steve and Michelle Holder. I mean, they're going to admit to using drugs. I mean so how much - - what's the jury going to give in terms of, "Okay, so they're cracked out, so what weight do we give to their testimony?" What those guys were going to say, I already had somebody saying it and he didn't have a bad record. He was a good witness and I wanted to stay with that.

It would be difficult to conceive of a more classic "trial strategy" reason for affirmatively deciding not to present the testimony of a witness such as Mr. Monts. This claim is without merit.

Similar to Defendant's claim regarding Monts, his claim regarding the Holders is based on one or both individuals admitting to committing a crime. Defendant is relying on Steve to testify that Defendant sells drugs out of his house and that he regularly receives drugs from Defendant, including the night in question. Defendant suggests that Michelle would confirm Steve's testimony and admit that on that night she went with Defendant while he conducted more drug sales. Defendant has not shown that there is a reasonable probability that the result of the trial would have been different had Steve and/or Michelle been called as witnesses. The absence of testimony from witnesses of somewhat dubious credibility that are owners of a house that is used for drug dealing, including a confession of smoking crack cocaine that night, does not undermine the confidence in the outcome.

(Exh. F, pp. 98-103).

To establish a claim of ineffective assistance of counsel, courts "should always presume strongly that counsel's performance was reasonable and adequate." *Atkins v. Singletary*, 965 F. 2d 952, 958 (11th Cir. 1992). And, "a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy." *Devier v. Zant*, 3 F.3d 1445, 1450 (11th Cir. 1993). Here, Petitioner has not shown that trial counsel's performance was deficient where he made a strategic decision not to call witnesses who would be required to admit at trial that they had committed crimes, especially where other more credible witnesses were testifying. Nor has Petitioner demonstrated that but for the failure to call these witnesses, the jury would have acquitted him. There were multiple eyewitness identifications of Petitioner, as well as DNA evidence placing him in the car. The verdict essentially came down to a question of credibility, with the jury finding Mr. Dloughy and Ms. Robinson's testimony more credible than that of Petitioner.

Accordingly, Petitioner has failed to demonstrate that the state courts' denial of this claim was an unreasonable application of *Strickland* or based on an unreasonable determination of the facts. Ground 4 does not warrant federal habeas relief.

**Ground Five**

Petitioner alleges that the cumulative effect of counsel's error resulted in a violation of his Sixth Amendment right to a fair trial. (Dkt. 1, p. 28). Petitioner has not shown an error of constitutional dimension with respect to any federal habeas claim. Therefore, he cannot show that the cumulative effect of the alleged errors deprived him of fundamental fairness in the state criminal proceedings. *See Morris v. Sec 'y, Dep't of*

*Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether post-AEDPA claims of cumulative error may ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law, but holding that petitioner's claim of cumulative error was without merit because none of his individual claims of error or prejudice had any merit); *Forrest v. Fla. Dep't of Corr.*, 342 F. App'x 560, 565 (11th Cir. 2009); *Hill v. Sec'y, Fla. Dep't of Corr.*, 578 F. App'x 805 (11th Cir. 2014)(same). Petitioner is not entitled to federal habeas relief on Ground Five.

Any of Petitioner's allegations not specifically addressed herein are without merit.

It is therefore **ORDERED AND ADJUDGED** that:

1. The Petition for Writ of Habeas Corpus (Dkt. 1) is **DENIED**. The **Clerk** shall enter judgment accordingly and close this case.

2. A Certificate of Appealability (COA) is **DENIED** in this case, since Petitioner cannot make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). And because Petitioner is not entitled to a COA, he is not entitled to proceed on appeal *in forma pauperis*.

**DONE AND ORDERED** in Ocala, Florida on March 23, 2020.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge

Copies to: Petitioner *pro se*; Counsel of Record